IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| COVENTRY HEALTH CARE OF NEBRASKA, INC., a Nebraska domestic corporation; | **4:16CV3094** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER** |
| NEBRASKA DEPARTMENT OF ADMINISTRATIVE SERVICES; NEBRASKA DEPARTMENT OF HEALTH & HUMAN SERVICES; DOUG PETERSON, in his official capacity as Attorney General of the State of Nebraska; BYRON DIAMOND, in his official capacity as Director, Nebraska Department of Administrative Services; COURTNEY PHILLIPS, CEO of the Nebraska Department of Health and Human Services; CALDER LYNCH, in his official capacity as Director of the Nebraska Department of Health and Human Services Division of Medicaid and Long Term Care; and BO BOTELHO, in his official capacity as Acting Material Division Administrator; | |
| Defendants, | |
| and | |
| NEBRASKA TOTAL CARE, INC.; WELLCARE OF NEBRASKA, INC.; and UNITEDHEALTHCARE OF THE MIDLANDS, INC.; | |
| Intervenors. | |
| AMERIHEALTH NEBRASKA, INC., a Nebraska corporation; | **4:16CV3100** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER** |
| NEBRASKA DEPARTMENT OF ADMINISTRATIVE SERVICES, a political subdivision of the State of Nebraska; NEBRASKA DEPARTMENT | |

OF HEALTH & HUMAN SERVICES, a
political subdivision of the State of
Nebraska; BYRON DIAMOND, Director
of the Nebraska Department of
Administrative Services; FRANCIS
BOTELHO, Administrator of the Nebraska
Department of Administrative Services
Materiel Division Administrator;
COURTNEY N. PHILLIPS, Chief
Executive Officer of the Nebraska
Department of Health and Human Services;
and CALDER A. LYNCH, Director of the
Nebraska Department of Health and Human
Services Division of Medicaid and Long-
Term Care;

    Defendants,

 and

WELLCARE OF NEBRASKA, INC.;
NEBRASKA TOTAL CARE, INC.; and
UNITEDHEALTHCARE OF THE
MIDLANDS, INC.;

    Intervenors.

   Coventry Health Care of Nebraska, Inc., d/b/a Aetna Better Health of Nebraska ("Aetna") and AmeriHealth Nebraska, Inc., d/b/a Arbor Health Plan ("Arbor Health") (collectively, "plaintiffs") unsuccessfully bid to provide managed-care services under Heritage Health, Nebraska's forthcoming comprehensive Medicaid managed-care program for physical health, behavioral health, and pharmacy services. In these consolidated cases, the plaintiffs each allege the Nebraska Department of Administrative Services ("DAS"), Nebraska Department of Health and Human Services ("DHHS"), and various state officials (collectively, the "State") exceeded their authority and violated state and federal law in awarding three multi-million dollar service contracts. The three successful bidders, United Healthcare of the Midlands, Inc. ("United"), WellCare of Nebraska, Inc. ("WellCare"), and Nebraska Total Care, Inc. ("NTC") have intervened (collectively, "intervenors" and with the State, "defendants").

Now before the Court are Aetna's Motion for Preliminary Injunction (Filing No. 21 in Case No. 4:16CV3094) and Arbor Health's Motion for Preliminary Injunction (Filing No. 21 in Case No. 4:16CV3100). The plaintiffs each move, pursuant to Federal Rule of Civil Procedure 65, to enjoin performance under the service contracts and further implementation of the Heritage Health program. After careful review of the many and complex issues presented by way of extensive exhibits, briefs, and oral argument, the motions for preliminary injunction are denied.

## I.    BACKGROUND

DHHS administers the Nebraska Medicaid program, which provides health-care coverage for approximately 233,000 low-income, elderly, and disabled Nebraska citizens. DHHS currently provides physical-health, behavioral-health, and pharmacy benefits through three different programs. Aetna is currently one of three managed-care organizations ("MCOs") that provide managed-care services under the physical-health program. Aetna has successfully provided those services for more than five years; its contract expires June 30, 2017. Another contractor manages the behavioral-health program under a contract set to expire August 31, 2016. The State provides pharmacy services.

On October 21, 2015, DAS issued Request for Proposal Number 5151 Z1 ("RFP") to solicit proposals from vendors from which DAS would select two or three qualified contractors to serve as MCOs for the consolidated Heritage Health program. Six different contractors submitted proposals, including Aetna, Arbor Health, the three intervenors, and another bidder not involved in these cases. State evaluators scored the bid proposals in two general scoring categories using a point system. The Corporate Overview section was worth up to 130 points and the Technical Approach section was worth up to 2,120 points for a total of 2,250 possible points. Five teams of five evaluators were assigned different sections and subsections to evaluate. Team 1

evaluated the Corporate Overview section and several Technical Approach sections. All evaluators were to review their assigned sections independently and confidentially.

After each evaluator had completed reviewing their assigned sections, the scores were averaged and totaled to determine each bidder's score. The RFP indicated "[t]he award may be granted to the highest scoring and responsible bidder" or that the State could ask such bidders "to submit best and final offers." The State expressly "reserve[d] the right to reject any or all proposals, wholly or in part" and "to waive any deviations or errors that [we]re not material, d[id] not invalidate the legitimacy of the proposal and d[id] not improve the bidder's competitive position." The RFP further provided, "All awards w[ould] be made in a manner deemed in the best interest of the State."

On February 5, 2016, DAS posted a Notice of Intent to Award ("First Notice of Intent") the Heritage Health contracts to the three highest-scoring bidders: United (1,680.4), NTC (1,669.6), and Aetna (1,605.6). WellCare (1,603.6) finished fourth, two points behind Aetna, and Arbor Health (1,509.2) finished a distant fifth. DAS also posted a final evaluation document that summarized the scores received by each proposal.

On February 19, 2016, WellCare and Arbor Health each protested the First Notice of Intent pursuant to the State's protest and review process. Among other things, they pointed out the failure of one evaluator on Team 1 to score the proposals in accordance with the instructions. Arbor Health also complained the RFP did not allow the evaluators sufficient discretion and did not allow them to consider factors required by Nebraska law.

On February 29, 2016, DAS issued a Notice of Withdrawal of Intent to Award, acknowledging some flaws in the scoring of the Corporate Overview section.[1] To address those errors, DAS slightly changed the scoring for that section and announced a team of new and impartial evaluators would perform a limited re-evaluation of only that

---

[1]No issues were raised by either party relating to the scoring or rescoring of the Technical Approach section.

section.  Two of the evaluators had no prior experience reviewing Medicaid proposals.  DAS notified the bidders that upon completion of the re-evaluation, DAS would recalculate each bidder's total score and post a new intent to award.  None of the bidders objected to the proposed re-evaluation process. The limited re-evaluation took place between March 2 and March 4, 2016.

On March 8, 2016, DAS issued a second Notice of Intent to Award ("Second Notice of Intent") the contracts to the three highest-scoring bidders after re-evaluation.  United (1,658.2) and NTC (1,652.6) finished first and second again, but WellCare (1,592.4) replaced Aetna (1,581.2) at third.  Aetna fell to fourth and Arbor Health (1,493.6) stayed a distant fifth.  DAS also released a final re-evaluation document that included the new scores received by each proposal.

On March 21 and March 22, 2106, respectively, Aetna and Arbor Health each protested the Second Notice of Intent.  By letters dated April 7, 2016, DAS denied the protests.  As allowed by the protest procedures, Aetna and Arbor Health each asked for further review of their protests and sought a meeting with Materiel Administrator, Francis "Bo" Botelho, and the Director of Administrative Services, Byron Diamond ("Director Diamond").

On April 14, 2016, before Aetna and Arbor Health met with Director Diamond, DAS and DHHS entered into contracts with United, NTC, and WellCare in accordance with the second award.  Arbor Health met with Director Diamond and other DAS officials on May 17, 2016; Aetna did the same on May 19, 2016.  Both received written confirmation of the denial of their protests by letter dated May 31, 2016.

The Heritage Health program is scheduled to begin January 1, 2017.  Since entering the contracts, the State and intervenors have been taking steps to implement the program, including forming committees, attending planning meetings, disseminating

Heritage Health information to providers and the public, and entering provider contracts. Open enrollment is scheduled to begin in September 2016.

Asserting state and federal claims, the plaintiffs each filed a complaint seeking declaratory and injunctive relief in Nebraska state court. The plaintiffs seek to enjoin further implementation of the Heritage Health program and additional expenditures of public funds because, as they see it, the award process was not open and fair as required by Nebraska law. They further allege the State exceeded its statutory authority and disregarded mandatory agency rules by re-evaluating the proposals. In particular, the plaintiffs contend the State did not comply with the Agency Procurement Manual for Services ("manual") in awarding the contracts.

The State removed both cases to federal court,[2] and United, NTC, and WellCare intervened. The plaintiffs each moved for a preliminary injunction. The Court consolidated the cases and conducted a lengthy joint motion hearing August 11, 2016, at which the parties jointly stipulated to allow the Court to consider the evidence in the record without objections.

## II.   DISCUSSION

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). In deciding whether to issue a preliminary injunction, the Court must consider "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

_____

[2]This Court has federal question jurisdiction over the plaintiffs' federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over their state-law claims under 28 U.S.C. § 1367(a).

## A.     Irreparable Harm

"To demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

The parties agree Nebraska substantive law governs the plaintiffs' state-law claims.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  "[E]nacted for the benefit of taxpayers," Nebraska's competitive-bidding statutes "assure[] the prudent expenditure of public money," *Anderson v. Peterson*, 375 N.W.2d 901, 904 (Neb. 1985).

The plaintiffs first argue they have established irreparable harm as a matter of Nebraska law as taxpayers trying to prevent the illegal expenditure of public funds.  In support, the plaintiffs rely on *Rath v. City of Sutton*, 673 N.W.2d 869, 883-84 (Neb. 2004), in which the Nebraska Supreme Court concluded "the injury that flows from an illegal expenditure of public funds is inherently irreparable."  According to the plaintiffs, the *Erie* Doctrine requires this Court to apply the *Rath* rule and find irreparable harm as a matter of law.  The plaintiffs' reliance on *Erie* and *Rath* are misplaced.

The plaintiffs each moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and sought relief based on federal equity principles.  Federal courts ordinarily apply federal rules of civil procedure in such circumstances. *See*, *e.g.*, *Hanna v. Plumer*, 380 U.S. 460, 467, 470-71 (1965).  And although the United States Supreme Court declined to consider whether the availability of an injunction in a diversity case should be determined by state or federal law, *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 n.3 (1999), and the Eighth Circuit apparently has yet to consider the precise question raised in these cases, at least six other circuits have long held that federal law provides the standard for determining whether a federal court should issue a preliminary injunction, even when "the right upon which th[e] cause of action is

based is state-created." *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977); *accord Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) ("[W]e apply our own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction."); *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1525 (11th Cir. 1994) (same); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (same); *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (same); *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) (same); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2943 (3d ed. 1998) (explaining why "the federal rule should control as against a contrary state practice").

The Court will apply traditional federal principles of equity in evaluating the plaintiffs' allegations of irreparable harm. That is not to say the plaintiffs' alleged harm as taxpayers is irrelevant; it simply means allegations of illegal expenditures of public funds do not unequivocally establish irreparable harm as a matter of law as the plaintiffs contend.

In addition to the harm Aetna alleges it suffered as a taxpayer, Aetna emphatically relies on *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371-72 (8th Cir. 1991), for the proposition "***loss of opportunity to meaningfully participate in a fair bidding process constitutes irreparable harm***." Arbor Health too claims it "suffered an individual injury due to the violation of its rights as a participant in the flawed [bidding] process." In *Glenwood Bridge*, the Eighth Circuit determined a contractor bidding on a public project was entitled to a preliminary injunction "prohibit[ing] the City from awarding to any contractor a contract containing an arguably illegal pre-hire agreement." *Id.* at 369. Noting the contractor would be essentially barred from bidding on the contract, the Eighth Circuit explained a "preliminary injunction both protect[ed] [the contractor's] interest in participating in a legal bidding process and ensure[d] that the

contract awarded w[ould] be a legal one." *Id.* at 372. As Aetna sees it, "[t]he inability to participate in a fair bidding procedure is itself" irreparable harm as a matter of law.

Finally, Aetna alleges it will suffer fundamental damage to its business in Nebraska absent injunctive relief and "will be forced to close its Medicaid operations in Nebraska." Aetna contends it is losing business, customers, and valuable employees as the defendants continue to implement the Heritage Health program.

The defendants deny the plaintiffs will suffer any irreparable harm if temporary injunctive relief is denied. As the defendants see it, the plaintiffs' alleged individual harms are basically commercial in nature and can be remedied by monetary damages. *See DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013) ("Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered.").

As for the plaintiffs' proposed interests as unsuccessful bidders, the State and WellCare argue *Glenwood Bridge* is distinguishable in several important ways. In particular, the State and WellCare emphasize (1) the defendant city in *Glenwood Bridge* threw out all the bids whereas the State in these cases conducted a limited re-evaluation of one section of the RFP to correct what everyone admits were errors; (2) the contractor in *Glenwood Bridge* was essentially unable to rebid while the plaintiffs here willingly took part in the re-evaluation without objection; and (3) the Eighth Circuit's analysis of irreparable harm in *Glenwood Bridge* was based on its threshold finding that the contractor was likely to succeed in establishing the city illegally interfered with the collective bargaining process. *Glenwood Bridge*, 940 F.2d at 370. According to the State and WellCare, the plaintiffs cannot meet their burden to show irreparable harm because they have failed to provide any evidence the State acted unlawfully, much less with bad motives.

The defendants' arguments are generally well taken. Aetna has not shown that any economic losses it may suffer will not be recoverable if Aetna eventually succeeds on the merits. *See, e.g.*, Iowa Utils. Bd., 109 F.3d at 426 ("[R]evenues and customers lost to competition which can be regained through competition are not irreparable." (quoting *Central & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 309 (D.C. Cir. 1985))).

With respect to the plaintiffs' alleged harms as taxpayers, the Court agrees with the Nebraska Supreme Court and the plaintiffs that taxpayers can suffer irreparable harm from the illegal expenditure of public funds in some circumstances. But the existence of that harm depends entirely on the taxpayer's ability to prove the challenged expenditures are illegal. As discussed more fully below, the plaintiffs here—despite having already obtained more than 20,000 documents from the State—struggle, at this point at least, to show the State has acted unlawfully in awarding the Heritage Health contracts or to show that additional expenditures of public funds to implement the program will be illegal.

The plaintiffs have also failed to show that the alleged deprivations of their proposed interests in a fair bidding process—whether as taxpayers or unsuccessful bidders—establish irreparable harm under the circumstances of these cases. *See, e.g.*, *Day v. City of Beatrice*, 101 N.W.2d 481, 486 (Neb. 1960) ("An unsuccessful bidder in the letting of a contract is not a proper party to bring a representative action."). In the Court's view, Aetna extracts too broad a rule from *Glenwood Bridge*—a case involving strong evidence of "important and troubling" illegal interference with collective-bargaining rights under federal labor law. Those issues have not been shown to be present here.

The Court does not read *Glenwood Bridge* as establishing an expansive rule that would permit any disgruntled bidder to "simply . . . point to a 'tainted' bidding process and claim irreparable harm." *C.S. McCrossan Constr., Inc. v. Minn. Dep't of Transp.*,

946 F. Supp. 2d 851, 858 (D. Minn. 2013). Such a rule would risk allowing disgruntled bidders to file suit and improperly interfere with the State's ability to provide essential government services while a lawsuit winds its way through the courts. *See id*.; *cf. M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1303 (D.C. Cir. 1971) ("It would be intolerable for any frustrated bidder 'to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign.'" (quoting *Blackhawk Heating and Plumbing Co. v. Driver*, 433 F.2d 1137, 141 (D.C. Cir. 1970))).

The plaintiffs have not met their burden of showing a great and imminent threat of irreparable harm absent equitable relief. *See Iowa Utils. Bd.*, 109 F.3d at 425. The Court will, nonetheless, assume, for purposes of these motions, the plaintiffs have shown the irreparable harm they allege and will weigh that harm against the harms an injunction would inflict on the defendants.

### B.      Balance of Harms and the Public Interest

As a result of the public contracts involved here and the plaintiffs' heavy reliance on their status as taxpayers, the balance-of-harms analysis and the public-interest analysis are closely related. Balanced against the plaintiffs' claims of illegal expenditures of public funds and unlawful attacks on the sanctity of the procurement process is the defendants' contention that a preliminary injunction that halts the ongoing implementation of the Heritage Health program will infringe on the State's sovereignty and jeopardize the health and well-being of the approximately 233,000 vulnerable Nebraskans who depend on the program becoming effective January 1, 2017, as scheduled. Explaining that they cannot realistically turn the rollout of the Heritage Health program "on and off at the flip of a switch," the defendants describe in great detail the significant steps they have taken and still must take to successfully implement the program on time, including holding meetings, attending planning sessions, building

infrastructure, conducting systems testing, disseminating information to providers and the public, entering provider contracts, and enrolling participants.

The State maintains it is unable to continue the current fragmented Medicaid system pending the resolution of these cases on the merits because the contract for behavioral-health services expires August 31, 2016, and the contracts for physical-health services expire June 30, 2017. According to the State, the defendants must continue to implement the Heritage Health program to ensure the stable and continuous delivery of critical Medicaid services and to reduce the costs to the taxpayers of providing those essential services. The State contends that not only will a delay impose heavy financial burdens on the State, it will also push its administrative burden to the breaking point, possibly putting federal funding for the entire Medicaid program at risk.

In addition to the substantial harms faced by the State and the public, the intervenors point out they have spent significant time, energy, expense, and corporate resources implementing the Heritage Health program. They have negotiated contracts, entered leases, and hired employees to run the program. WellCare states it has already spent $10 million implementing the program and will lose $2 million every month the contract is delayed.

In response, the plaintiffs argue the Court should ignore the harms the defendants face because they are largely self-inflicted and avoidable. *See*, *e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011). As the plaintiffs see it, the State brought the alleged harm upon itself by improperly awarding the bids and can avoid any harm by changing the deadlines for implementing the Heritage Health program and extending its existing contracts. The argument is without merit.

Even if the Court were to assume the State could change all of its deadlines and extend its existing contracts, it would not mean the State and intervenors (not to mention the Medicaid beneficiaries and the taxpayers) would suffer no harm from the changes and

resulting delay in implementing the Heritage Health program. And to say the Court should not consider harms the State and intervenors could avoid by abstaining from the very conduct the plaintiffs seek to enjoin turns the *Dataphase* analysis on its head. By that logic, the harm suffered by every defendant resisting injunctive relief would, at least to some degree, be self-inflicted and avoidable. The plaintiffs' cited authorities do not support such a proposition.

Given the nature of the contracts at issue here, the public interest weighs on both sides of the scale. The public's interest in a fair bidding process and proper expenditure of taxpayer funds is probative but not determinative here. Although the plaintiffs claim the bidding process is illegal and unjust and allege misuse of public funds, there is really no evidence of anything more than a few relatively minor errors in the initial evaluation process and a well-intentioned effort by the State to remedy those errors as quickly and painlessly as possible for all involved. There is certainly no evidence, or even an earnest allegation, of any nefarious or fraudulent motives or any illicit profit from the awards in this case. *See Day*, 101 N.W.2d at 487 (explaining public officials are presumed to "act[] in good faith, with honest motives, and for the purpose of promoting the public good and protecting the public interest").

The Court is aware that some of the steps the defendants take to further implement the Heritage Health program during the pendency of these actions may have to be redone if the plaintiffs were to prevail on the merits; however, the Court concludes the public's interest in implementing the program without any undue delay is compelling and outweighs any countervailing interests. *See*, *e.g.*, *ACS State Healthcare, LLC v. Heineman*, No. 4:08CV3021, 2008 WL 608638, at *6 (D. Neb. Feb. 29, 2008) ("The public has an interest in having a working [Medicaid Management Information System] and seeing that the replacement [system] is put in place in a timely manner.").

The balance of the various public interests at issue in these cases and the balance of the harms to the parties weigh against granting injunctive relief.

## C.    Probability of Success on the Merits

### 1.    State-Law Claims

Nebraska law requires "a standardized, open, and fair process for selection of contractual services." Neb. Rev. Stat. § 73-501. Under Neb. Rev. Stat. § 73-504(2), "[a]ll proposed state agency contracts for services in excess of fifty thousand dollars shall be bid in the manner prescribed by the division procurement manual or a process approved by the Director of Administrative Services."

Although they have different points of view and assert slightly different claims, the main thrust of the plaintiffs' respective claims is that the State exceeded its statutory authority and failed to follow its manual in awarding the contracts. According to the plaintiffs, the plain language of §§ 73-501 to 73-510, the legislative history of those provisions, and DAS's own interpretation and prior pronouncements establish that the manual has the force of law and is legally binding on the State.

In Counts I and II of its Complaint, Aetna seeks a ruling under the Nebraska Administrative Procedure Act, Neb. Rev. Stat. § 84-911, and the Nebraska Uniform Declaratory Judgments Act, Neb. Rev. Stat. § 25-21,150, that DAS exceeded its authority in withdrawing its initial intent to award a contract to Aetna and re-evaluating the proposals based on what Aetna sees as harmless errors. Relying on the first clause of Neb. Rev. Stat. § 73-504(2), Aetna also contends DAS violated Nebraska law by failing to conduct the re-evaluation in strict accordance with the manual. In particular, Aetna complains that in re-evaluating the bids, DAS (1) did not use qualified subject-matter experts; (2) did not subject the evaluators to the required selection, training, and control processes; (3) violated the requirement that the same evaluators evaluate both sections; (4) permitted improper communications between evaluators; and (5) failed to comply

with the scoring criteria in the manual. Aetna also contends DAS abused its discretion and acted arbitrarily by waiving the prohibition against "offshoring" and failing to disqualify non-responsible bidders.

Having placed fifth in both the initial evaluation and the re-evaluation, Arbor Health raises similar arguments based on the same statutes but focuses on the entire award process. In Counts I and II, respectively, Arbor Health contends the State violated §§ 73-504 and 73-501 by failing to follow the manual. In Count III, Arbor Health alleges the State violated Neb. Rev. Stat. § 81-161(2) by failing "to consider the statutorily-mandated factors in determining the lowest responsible bidders." Arbor Health complains only four questions addressed those factors and those questions were only worth twenty points. In Count IV, Arbor Health asserts the State improperly applied an agency standard because it failed to comply with the manual, and in Count V, Arbor Health alleges the structure of the RFP and its scoring methodology made both awards arbitrary and capricious.

Having carefully reviewed the record and the parties' submissions, the Court concludes the plaintiffs have failed to establish that any of their state-law claims are likely to succeed on the merits. The defendants raise some legitimate questions about whether sovereign immunity bars at least some of the plaintiffs' state-law claims, but those issues need not be addressed in connection with these motions. Even if the Court assumes the plaintiffs have alleged cognizable claims, the plaintiffs have not shown a reasonable probability that they can prove the State exceeded its statutory authority or acted arbitrarily and capriciously (or otherwise abused its discretion) in awarding the contracts.

To begin, several of the plaintiffs' specific claims regarding the State's compliance with the manual do not withstand closer scrutiny. For example, there is no evidence of any favoritism for or any prejudice against any bidder. And Aetna's claims

that the evaluators had no subject-matter expertise or qualifications of any kind and engaged in prohibited communications during the re-evaluation are belied by the record. Neither the manual nor the RFP define the term "subject matter expert," but the Court finds the evaluators' pertinent backgrounds and vast business experience gave them sufficient subject-matter expertise to evaluate the Corporate Overview sections of the RFP. The Court's review of the record also reveals nothing improper about the evaluators' communications—none of which related to scoring.

Perhaps more importantly, the plaintiffs propose an unduly narrow interpretation of the relevant competitive-bidding statutes and an overly restrictive view of the State's discretion to evaluate bid proposals and award contracts under those statutes. For example, in arguing the State exceeded its statutory authority and violated mandatory provisions in the manual, the plaintiffs heavily rely on the first clause of § 73-504(2), which provides for bidding pursuant to the manual. But the State maintains it acted pursuant to the second clause of § 73-504(2), which authorizes the State to bid a service contract by "a process approved by the Director of Administrative Services." In the State's view, the broad grant of statutory discretion in § 73-504(2) gave the Director authority to approve and conduct the limited re-evaluation, which he did without prior objection from the bidders. *See Rath*, 673 N.W.2d at 886 ("A review of our cases makes it clear that public officials are granted discretion under the competitive bidding statutes.").

In support of the State's position, Director Diamond submits a Declaration stating "all procedures regarding the Heritage Health RFP and the associated grievance processes were approved under [his] authority and were done with either [his] advanced knowledge or subsequently ratified by [him]." The Court agrees with the plaintiffs that this declaration is very broad and Director Diamond and the other state officials may be required to provide more detail as these cases progress, but the Court is not convinced the plaintiffs have shown that Director Diamond's approval exceeded his statutory authority

under § 73-504(2). The plaintiffs complain there is no evidence of *prior* approval, a writing, or any formal policy or procedure supporting the State's action. But the plain language of § 73-504(2) does not impose the kind of limitations on the Director's discretion the plaintiffs propose. *See*, *e.g.*, *Village at N. Platte v. Lincoln Cty. Bd. of Equalization*, 873 N.W.2d 201, 205 (2016) ("Statutory language is to be given its plain and ordinary meaning.").

Arbor Health argues the State's interpretation of the Director's authority to approve a bidding process under § 73-504(2) defeats the purpose of the statutory scheme because it gives the Director unbridled discretion to award contracts whenever and however he wants. The Court is satisfied other statutory limitations, including the requirement that the bidding process be "standardized, open, and fair," Neb. Rev. Stat. § 73-501, and traditional judicial oversight of the Director's exercise of his discretion will rein in any potential abuse. *Rath*, 673 N.W.2d at 886 (explaining the role the courts play in determining when public officials' "freedom of action is curtailed" to prevent fraudulent practices).

In fact, the plaintiffs call on the Court to perform that role here and evaluate the State's discretionary decisions in determining the probability the plaintiffs will succeed on the merits. Under Nebraska law, the Court must "show deference when reviewing challenges to [the State's] responsibility determinations and award decisions." *Id.* at 887 ("Where there is a showing that the administrative body, in exercising its judgment, acts from honest convictions, based upon facts, and as it believes for the best interests of its municipality, and where there is no showing that the body acts arbitrarily, or from favoritism, ill will, fraud, collusion, or other such motives, it is not the province of a court to interfere and substitute its judgment for that of the administrative body." (quoting *Best v. City of Omaha*, 293 N.W. 116, 118 (Neb. 1940))).

The parties disagree as to how far that deference extends. In *Rath*, the Nebraska Supreme Court stated "whenever a public body has discretion to make a decision during the bidding process, a court is essentially limited to reviewing that decision for bad faith." *Id.* Based on that statement, the defendants contend the Court can only review for bad faith—something the plaintiffs have not alleged.

The plaintiffs see things differently. They contend they must only show the State's actions were arbitrary and capricious. *See*, *e.g.*, *Banks, Jr. v. Hous. Auth. of City of Omaha*, 795 N.W.2d 632, 635 (Neb. 2011).

The Court need not resolve the parties' dispute as to the proper standard of review at this stage because the plaintiffs have not shown they are likely to succeed under either standard. While admittedly not perfect, the State's actions in evaluating the proposals and awarding the contracts were not arbitrary and capricious. The evidence before the Court indicates the State fairly, openly, and judiciously exercised its statutory authority in both the initial evaluation and the limited re-evaluation. The State appears to have "act[ed] from honest convictions, based upon facts, and as it believe[d] for the best interests of" the State, the Medicaid beneficiaries, the taxpayers, and the bidders. *Rath*, 673 N.W.2d at 887 (quoting *Best*, 293 N.W. at 118).

### 2. Federal Claims

The plaintiffs also assert federal claims under 42 U.S.C. § 1983. "A plaintiff invoking section 1983 'must assert the violation of a federal *right*, not merely a violation of federal *law*.'" *See Ctr. for Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688, 699 (8th Cir. 2012) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)) (emphasis in *Blessing*).

In Count III of its Complaint, Aetna claims the State violated its right to due process under the Fourteenth Amendment to the United States Constitution by withdrawing the initial intent to award Aetna a contract. Arbor Health alleges, in Count

VI of its Complaint, the State violated its due process rights by executing the contracts before completing the grievance process.

To succeed on their due process claims, the plaintiffs must show the State deprived them of a protected property interest without due process of law. *Demien Constr. Co. v. O'Fallon Fire Prot. Dist.*, 812 F.3d 654, 657 (8th Cir. 2016). Protected property interests "are those to which a person holds a 'legitimate claim of entitlement,' and stem from 'independent source[s] such as state law.'" *Id.* at 658 (alteration in original) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "[O]rdinarily an unsuccessful bidder for public work has acquired no legal right to protect" under Nebraska law. *Day*, 101 N.W.2d at 488; *accord Demien Constr. Co.*, 812 F.3d at 658 (concluding a rejected bidder did not obtain a property right in the contract under Missouri law because the state reserved the right to reject all bids).

Despite *Day*, Aetna argues it obtained a protected property interest when the State initially indicated its intent to award a contract to Aetna as one of the highest-scoring responsible bidders. In Aetna's view, once the State indicated that intent to award Aetna the contract, the State no longer had discretion under the competitive bidding-statutes and manual to withdraw the First Notice of Intent. *See Prime Realty Dev., Inc. v. City of Omaha*, 602 N.W.2d 13, 17 (1999) ("Only when a statute or ordinance eliminates the decisionmaking power of a city, by making the city's obligation to act mandatory when a party fulfills the requirements of the statute, is a significant property interest created.").

Having finished fifth in both the evaluation and the re-evaluation, Arbor Health focuses not on the award but on the grievance process. According to Arbor Health, it has a legitimate claim of a protected property right based on its right to protest the award.

Neither plaintiff is likely to succeed on the merits on these claims. The publication of a notice of *intent* to award a contract to Aetna is not tantamount to an actual contract, and the considerable discretion the State retains under the relevant

competitive-bidding statutes and the RFP undercuts Aetna's claim that it has a legitimate claim of entitlement because the award to Aetna somehow became mandatory upon the State giving notice of its intent to award. *See Demien Constr. Co.*, 812 F.3d at 658.

As for Arbor Health's alleged interest based on the grievance process, Arbor Health provides no authority to support its assertion of such a right. "The mere fact that the state had established certain . . . review procedures did not transform those procedures into substantive interests entitled to federal constitutional protection." *Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 935 (8th Cir. 2016).

The plaintiffs' remaining federal claims fare no better. In Count IV of its Complaint, Aetna argues the State's failure to follow its standard policies and procedures violated Aetna's rights under federal law and the Supremacy Clause. Arbor Health's last claim, Count VII, similarly asserts the State failed to comply "with state procurement and procedures as required by federal law." Both plaintiffs contend the Medicaid Act, 42 U.S.C. § 1396a, and 45 C.F.R. § 75.326 required the State to comply with federal law and gave the plaintiffs a private right of action under 42 U.S.C. § 1983.

"Private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To establish "a particular statutory provision gives rise to a federal right," the plaintiffs must show (1) "Congress . . . intended that the provision in question benefit the plaintiff," (2) "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) "the statute . . . unambiguously impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 341 (quoting *Wright v. Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 431-32 (1987)).

The plaintiffs do not make this showing. Leaving aside the other flaws in their claims, the plaintiffs have failed to establish the federal authority on which they rely unambiguously confers on an unsuccessful bidder a private right of action enforceable

under 42 U.S.C. § 1983. *See*, *e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit.").

**III.  CONCLUSION**

The Court finds each of the *Dataphase* factors weighs in favor of the defendants. On the record before the Court, the plaintiffs have failed to establish the need for the extraordinary remedy of injunctive relief.  Accordingly,

IT IS ORDERED:

1.  Aetna's Motion for Preliminary Injunction (Filing No. 21 in Case No. 4:16CV3094) is DENIED.

2.  Arbor Health's Motion for Preliminary Injunction (Filing No. 21 in Case No. 4:16CV3100) is DENIED.

Dated this 19th day of August, 2016.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge